UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JAMES W.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:19-cv-1027 |
| | ) |
| ANDREW M. SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the Commissioner filed by the plaintiff, James W., on November 11, 2019.  For the following reasons, the decision of the Commissioner is **AFFIRMED.**

*Background*

The plaintiff, James W., filed an application for Supplemental Security Income on August 15, 2016, alleging a disability onset date of May 1, 2016.  (Tr. 21).   The claim was denied initially on May 16, 2017, and upon reconsideration on August 28, 2017. (Tr. 21).  On October 3, 2017, James W. filed a written request for a hearing pursuant to 20 CFR § 416.1429.  The video hearing was held on August 28, 2018, before Administrative Law Judge (ALJ) John Carlton. (Tr. 21).  Vocational Expert (VE) Marie Barhydt appeared (by telephone) and testified at the hearing.  (Tr. 21).  This was James W.'s sixth application, and the fifth application that was appealed to the hearing level. (Tr. 21).  The most recent unfavorable decision was issued on May 2, 2016. (Tr. 21).  Since James W. alleged a disability onset date of May 1, 2016, the ALJ found that an implied request for reopening had been made.  (Tr. 21).  With that, the ALJ found that no

---

[1] To protect privacy, the plaintiff's full name will not be used in this Order.

new and material evidence had been submitted that would establish good cause to reopen the May 2, 2016 decision. (Tr. 21).  On November 11, 2019, James W. filed this petition for judicial review. Despite the alleged onset date being prior to the ALJ's May 2, 2016 decision, this is a review of only the November 6, 2018 unfavorable decision where the ALJ used the application date of August 15, 2016 as the alleged onset date.

At step one of the five-step sequential analysis for determining whether an individual is disabled, the ALJ found that James W. had not engaged in substantial gainful activity since August 15, 2016, the application date.  (Tr. 23).

At step two, the ALJ determined that James W. had the following severe impairments: degenerative disc disease; status post lumbar fusion; anxiety, depression/bipolar disorder; and schizoaffective disorder.  (Tr. 23).  The ALJ found that James W.'s severe impairments significantly limited his ability to perform basic work activities.  (Tr. 23).  Furthermore, the ALJ found that James W.'s history of wrist infections and tremors did not represent severe impairments. (Tr. 24). Lastly, the ALJ noted that James W.'s substance use had not resulted in work-related limits or in greater limits than other mental impairments. (TR. 25).

At step three, the ALJ concluded that James W. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 25).  The ALJ indicated that he considered Listing 1.04 (Disorders of the spine) and found that James W. did not have an impairment that met Listing 1.04's criteria. (Tr. 25).  Specifically, he found no evidence of root compression, limitation of motion, motor loss, a positive straight-leg raising test, spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication. (Tr. 25).

The ALJ also considered whether the severity of James W.'s mental impairment met or medically equaled the criteria of Listings 12.03, 12.04, or 12.06.  (Tr. 25).  The ALJ considered

the paragraph B criteria for mental impairments, which required at least one extreme or two marked limitations in a broad area of functioning which include:

> understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing themselves.

(Tr. 25). The ALJ indicated that a marked limitation meant the ability to function independently, appropriately, effectively, and on a sustained basis was seriously limited, while an extreme limitation was the inability to function independently, appropriately, or effectively, and on a sustained basis. (Tr. 25). The ALJ found that James W. had a moderate limitation understanding, remembering, or applying information; a moderate limitation interacting with others; a moderate limitation concentrating, persisting, or maintaining pace; and a moderate limitation adapting or managing himself. (Tr. 25-26). The ALJ noted that James W.'s attorney argued that the criteria of Listing 12.03 (schizophrenia spectrum and other psychotic disorders) were met based upon opinions received from Dr. M. Platt. (Tr. 25). However, the ALJ found that the limits endorsed were inconsistent with findings made by Dr. Platt and with normal psychiatric examinations otherwise made by numerous treating sources. (Tr. 25). Because James W.'s mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the ALJ determined that the paragraph B criteria were not satisfied. (Tr. 26). Additionally, the ALJ determined that James W. did not satisfy the paragraph C criteria. (Tr. 27).

After consideration of the entire record, the ALJ then assessed James W.'s residual functional capacity (RFC) as follows:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: stand/walk up to four hours in an eight-hour workday, and sit up to six hours; requires a sit/stand option where he can remain on task at the workstation, in either a seated or standing position, and he can hold position for at

3

> least 20 minutes before needing to shift positions; no ladders, ropes, or scaffolds; no slippery or uneven surfaces; occasional ramps and stairs; occasionally balance, stoop, crouch, crawl, and kneel; no unprotected heights or dangerous machinery; no operating motor vehicle as a condition of employment; simple, routine work not done at production rate pace; and, can interact with and react appropriately with supervisors and coworkers on an occasional basis, but is limited to no more than superficial interactions with the general public.

(Tr. 27). The ALJ explained that in considering James W.'s symptoms he followed a two-step process. (Tr. 27). First, he determined whether there was an underlying physical or mental impairment that was shown by a medically acceptable clinical or laboratory diagnostic technique that reasonably could be expected to produce James W.'s pain or other symptoms. (Tr. 27). Then he evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited James W.'s functioning. (Tr. 27).

After considering the evidence, the ALJ found that James W.'s medically determinable impairments reasonably could be expected to cause some of the alleged symptoms. (Tr. 28). However, the ALJ concluded that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 28).

At step four, the ALJ determined that James W. had no past relevant work. (Tr. 33). Considering James W.'s age, education, work experience, and RFC, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that he could perform, including router (50,000 jobs nationally), office helper (38,000 jobs nationally), and power screwdriver operator (40,000 jobs nationally). (Tr. 33). The ALJ found that James W. had not been under a disability, as defined in the Social Security Act, from August 15, 2016, the date the application was filed, through the date of the ALJ's decision, November 6, 2018. (Tr. 34).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive"); ***Moore v. Colvin***, 743 F.3d 1118, 1120–21 (7th Cir. 2014); ***Bates v. Colvin***, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence"). Courts have defined substantial evidence as such relevant "evidence as a reasonable mind might accept to support such a conclusion." ***Zoch v. Saul***, 2020 WL 6883424, at *3 (7th Cir. Nov. 24, 2020); ***Biestek v. Berryhill***, 139 S. Ct. 1148, 1154 (2019); ***Bates***, 736 F.3d at 1098. A court must affirm an ALJ's decision if the ALJ supported his findings with substantial evidence and if there have been no errors of law. ***Roddy v. Astrue***, 705 F.3d 631, 636 (7th Cir. 2013) (citations omitted). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." ***Lopez ex rel Lopez v. Barnhart***, 336 F.3d 535, 539 (7th Cir. 2003).

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. § 404.1520**. The ALJ first considers whether the claimant is presently employed and "doing . . . substantial gainful activity." **20 C.F.R. § 404.1520(b)**. If he is, the claimant is not disabled and the evaluation process is over. If she is not, the ALJ next addresses whether the claimant has a

5

severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. § 404.1520(c)**; *see* **Williams v. Colvin**, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work.  If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled.  **20 C.F.R. § 404.1520(e)**.  However, if the claimant shows that her impairment is so severe that she is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  **42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f);** *see* ***Biestek v. Berryhill,*** 139 S. Ct. 1148 (2019) (upon the request of a disability benefits applicant, a vocational expert's refusal to provide the private market-survey data underlying her opinion regarding job availability does not categorically preclude the expert's testimony from counting as "substantial evidence" but, instead, the inquiry is case-by-case).

    James W. has requested that the court remand this matter for additional proceedings, or in the alternative, reverse the ALJ's decision and award benefits.  In his appeal, James W. argues that:  (1) the ALJ failed to weigh the opinion evidence in accordance with the treating physician rule, rendering his RFC determination unsupported by substantial evidence and that (2) the ALJ failed to reconcile his RFC determination with the opinions of the state agency psychological consultants, rendering his RFC determination unsupported by substantial evidence.

6

First, James W. argues that the ALJ failed to weigh the opinion evidence of Dr. Platt in accordance with the treating physician rule, rendering the ALJ's RFC determination unsupported by substantial evidence. In determining a claimant's RFC, the ALJ evaluates "the claimant's ability to do physical and mental work activities on a regular and continuing basis despite limitations from her impairments" *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); *see* **20 C.F.R. § 404.1545(a)(1)** ("Your residual functional capacity is the most you can still do despite your limitations"); **SSR 96-8p**, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities"). The RFC is based upon medical evidence—including statements from medical sources about what the claimant still can do—as well as "other evidence, such as testimony by the claimant or his friends and family." *Craft v. Astrue,* 539 F.3d 668, 676 (7th Cir. 2008); **20 C.F.R. § 404.1545(a)(3).**

SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation. In the section titled, "Narrative Discussion Requirements," **SSR 96-8p** specifically spells out what is needed in the ALJ's RFC analysis. This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

7

**SSR 96-8p** (footnote omitted).  Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what he must articulate in his written decision.  "The ALJ is not required to address every piece of evidence or testimony presented, but [she] must provide a 'logical bridge' between the evidence and his conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).  Although the ALJ does not need to discuss every piece of evidence, he cannot ignore evidence that undermines his ultimate conclusions.  *Moore*, 743 F.3d at 1123 ("The ALJ must confront the evidence that does not support his conclusion and explain why that evidence was rejected") (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)).  "A decision that lacks adequate discussion of the issues will be remanded." *Moore*, 743 F.3d at 1121.

An ALJ must "consider the limitations imposed by all impairments, severe and non-severe." *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019); **20 C.F.R. §416.923**.  The duty to analyze non-severe impairments in formulating a claimant's RFC to be used at steps four and five is fundamental to the disability programs under the Social Security Act. *See Bowen v. Yucker*, 482 U.S. 137, 150-51, 107 S. Ct. 2287, 96 L.Ed. 2d 119 (1987) (emphasizing the duty of the Commissioner, when there is at least one severe impairment, to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity" (quoting **42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(F)** (1982 ed. And Supp. III)).  "Although the non-severe impairments may not have an effect on the claimant's RFC ultimately, the ALJ [is] required to explain why." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010).

James W. argues that had the ALJ properly evaluated Dr. Platt's opinions in accordance

8

with the treating physician rule, the ALJ would have found him disabled under SSR 85-15.  Dr. Platt was James W.'s treating physician who ultimately opined that James W. was "disabled and unable to work." (Tr. 32).  James W. claims that the ALJ's position that Dr. Platt's opinions were inconsistent with the records is unsupported by specific evidence or records.

The Commissioner claims the opposite.  The Commissioner argues that the ALJ's rejection of Dr. Platt's opinions was warranted give the substantial contrary evidence cited. The Commissioner contends that the contradictory evidence included medical records from James W.'s voluntary mental hospitalization and mental status examinations at an addiction services intake which took place around and during the time he was treated by Dr. Platt.

An ALJ "may not selectively consider medical reports" and must "consider 'all relevant evidence.'" *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). While an ALJ may adopt medical opinions concerning a claimant's ability to perform work-related activities, the RFC assessment is an issue reserved for the ALJ.  **20 C.F.R. §§ 404.1545(e), 416.945(e);** *SSR 96-5p*, 1996 WL 374183, at *2 (July 2, 1996) ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment").  An ALJ "is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians."  *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).  Rather, "the determination of a claimant's RFC is a matter for the ALJ alone – not a treating or examining doctor – to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (citing **20 C.F.R. § 404.1520(d)**).

The law distinguishes between treating physicians and non-treating physicians in social security benefit cases.  The opinion of a treating physician concerning a patient's condition is "give[n] more weight …, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)."  *Misener v.*

*Astrue*, 926 F.Supp.2d 1016, (N.D. Ind. 2013) (internal citations omitted); *see also* **Boiles v. Barnhart**, 395 F.3d 421, 426 (7th Cir. 2005). However, a treating physician's opinion should only be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." **20 C.F.R. § 416.927(c)(2)**. When controlling weight is not given, the ALJ is expected to have considered the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the opinion's consistency with the record as a whole, the physician's specialties, and any other relevant factors. **§ 416.927(c)**. In doing so, "an ALJ must articulate, at least minimally, his analysis of the evidence so that [the] court can follow his reasoning." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Looking specifically to Dr. Platt's opinions, the ALJ began by noting that there was six-month gap in treatment between March and September 2016. (Tr. 30). During the September 2016 visit, Dr. Platt noted that James W. had reported increased depression, irritability, and hearing voices. (Tr. 370). James W. also stated that he consumed alcohol and that the next thing he remembered was waking up in jail due to a domestic violence incident. (Tr. 370). The ALJ stated that it was not until later that Dr. Platt recorded the domestic incident as occurring during a manic phase, but that records at the time strongly suggested that the use of alcohol and drugs was the major contributing factor. (Tr. 30). The ALJ found that Dr. Platt's records reflected a suicide attempt shortly thereafter, but treatment never was sought. (Tr. 370).

During the October 10, 2016 visit, Dr. Platt diagnosed James W. with schizoaffective disorder and medications were prescribed and adjusted. (Tr. 31). Dr. Platt's notes from the November 15, 2016 visit stated that James W. was feeling depressed and irritable and that these symptoms have persisted over the last month (Tr. 360). On February 17, 2017, James W.

reported that his mood was "so-so", his depression was moderate, and that the medications were working well. (Tr. 31).  During the March and May 2017 visits, the ALJ stated that Dr. Platt's records reflected that mental status examinations remained unchanged and that James W.'s depression and anxiety were due to legal issues related to the domestic violence incident. (Tr. 31). However, by the July 21, 2017 visit, his mood was "good", and he told Dr. Platt that a bench warrant for his arrest had been removed.  (Tr. 31). The ALJ highlighted that Dr. Platt's records for the October 20, 2017 visit reflected that James W.'s mood was depressed due to him being on probation, however he was relieved that he did not receive any jail time. (Tr. 31).   During that visit, James W. again confirmed that his medications were helping him. (Tr. 31).  On December 15, 2017, Dr. Platt noted that James W. reported an irritable mood and racing thoughts at night. (Tr. 31). As a result, Dr. Platt increased James W.'s medication dosage. (Tr. 31).  The ALJ noted the last appointment between Dr. Platt and James W. occurred on May 11, 2018 where James W. reported that his mind raced "incessantly" and he was anxious regarding his upcoming disability hearing, but that his mental status examination remained unchanged.  (Tr. 31).

     The question that remains is whether the ALJ erred when he did not give controlling weight to Dr. Platt's findings.  James W. claims that since the ALJ did not give controlling weight to Dr. Platt's opinions, the ALJ failed to abide by the treating physician standard.  While the idea that a treating physician knows the condition of its patient best is convincing, the law is clear, an ALJ is entitled to reject a treating physician's opinion when there is substantial evidence in the record contradicting it.  *See generally* **Duncan v. U.S. R.R. Retirement Bd**., 787 F.3d 400 (7th Cir. 2015); **Clifford v. Apfel**, 227 F.3d 863, 870 (7th Cir. 2000) (citing **Herron v. Shalala**, 19 F.3d 329, 333 (7th Cir. 1994) (finding that an "ALJ cannot, without adequate explanation, discount an uncontradicted, dispositive medical condition")). Here, the ALJ supported his contrary findings with substantial evidence, warranting the rejection of Dr. Platt's opinions.

11

Dr. Platt completed three mental assessments of James W.'s ability to engage in work-related activities. The first, dated November 2, 2016, stated that James W. could remember and follow simple instructions, make simple work-related decisions, maintain personal appearance, but could not respond appropriately in work situations, respond to supervisors or co-workers, and could not deal with changes in routine work settings. (Tr. 335).  In a February 2017 function report completed by Nurse Practitioner M. Weaver, James W. denied difficulties getting along with others, and when asked about getting along with authority figures, he responded "good, I guess." (Tr. 26).  However, in the August 2017 function report, he said "I don't" when asked again whether he got along with authority figures. (Tr. 26).

Dr. Platt's letters, based on the September 20, 2016 and October 11, 2016 visits, concluded that James W. was "unable to function in the stress of a workplace environment," therefore making him "disabled and unable to work." (Tr. 337, 338).  These office visits came after a 6-month gap in treatment and a domestic violence incident. (Tr. 337, 338).  Dr. Platt's assessment of James W. from the March 2016 visit stated James W. reported depression and anxiety and attributed irritability to "financial stressors and the stress of an upcoming disability hearing." (Tr. 375).  Six months later, Dr. Platt's notes for the October 2016 visit reflected that James W.'s reported being no longer manic, had less racing thoughts, but had anxiety regarding his battery charge and upcoming court hearing.  (Tr. 366).  James W.'s medications were adjusted and increased during this visit.  (Tr. 366). Dr. Platt opined that the domestic violence issue occurred due to James W. being in a manic phase, but James W. later told addiction services that he was under the influence of alcohol at the time of the incident. (Tr. 444).  He also reported that he was under the influence during a similar incident that took place years prior. (Tr. 444).

As stated above, during the November 15, 2016 visit, Dr. Platt's notes stated that James

W. reported feeling depressed and irritable over the last month but that he "attribute[d] this primarily due to assault charges he is facing from a previous manic episode." (Tr. 360). Dr. Platt also noted that "the patient appears more calm and less manic since receiving Abilify Maintena injection." (Tr. 360).

Dr. Platt's records indicated that James W. reported hearing voices beginning on September 12, 2016 through January 2017 but denied hearing them in February 2017. (Tr. 421). Dr. Platt's records reflected no new complaints through the most recent visit in May 2018, and James W. denied hearing voices during both the March 2018 addictions intake and the mental status examinations during impatient treatment. (Tr. 26).

During James W.'s January 10, 2017 visit with Dr. Platt, he described his mood as depressed and irritable and continued to have concern "due to an upcoming court date next week regarding an assault charge." (Tr. 355). He stated that he felt constantly anxious, tense and on edge. (Tr. 355). He requested that his medications be adjusted. (Tr. 355). Dr. Platt's February 17, 2017 notes reflected that the medications were working very well for James W. as they kept him "calm and at ease." (Tr. 31). The mental status examinations during the March and May 2017 visits indicated that James W. reported depression and anxiety but said this was due to looming legal issues related to a domestic violence charge. (Tr. 31, 411-12, 416,)  By October 2017, James W. reported that he was depressed again but that it was due to being on probation. He again stated his medications were keeping him "calm and at ease." (Tr. 31).

During the December 2017 mental status exam, James W. stated that he "used to be much more manic than now," his thought process remained goal oriented, but his mood was depressed. (Tr. 436). James W. reported racing thoughts and "continued stress as he [wa]s on probation after being assaultive during a manic episode." (Tr. 436). During his latest visit, May 11, 2018, with Dr. Platt, James W. stated that his mind raced "incessantly" and that he was anxious

13

regarding his disability hearing. (Tr. 431).  However, two months prior, during his addictions intake, James W. was reported to be alert and oriented, mood was pleasant, and affect was appropriate. (Tr. 445). He did not report hallucinations or suicidal ideations but did report that he had them six months earlier. (Tr. 440). He denied ever having a problem with sleep, but almost all of Dr. Platt's assessments stated that James W. had issues with sleeping or insomnia. (Tr. 339, 440, 436, 449). James W. reported that his mind raced and that he used cocaine but that it was not a problem because his family did not know. (Tr. 441). He also stated that he "d[id] not believe he ha[d] ever seriously tried to quit alcohol before, but kn[ew] he was drinking too much." (Tr. 441).  Finally, there were no abnormal psychiatric findings noted during inpatient treatment in December 2017 and early 2018.  (Tr. 26).

Finally, Dr. Platt's May 11, 2018 and June 5, 2018 mental assessments stated that James W. could not follow simple instructions and make simple, work related decisions. (Tr. 462-464, 619-21).  The May 11, 2018 assessment came after a five-month gap in treatment, and the June 5, 2018 assessment was completed, assumedly, based off the May 11, 2018 visit because there is no evidence of another meeting between Dr. Platt and James W. after May 11, 2018.

James W. relies on several Seventh Circuit cases to support his position that the ALJ improperly weighed Dr. Platt's opinions.  The court finds it necessary to address two of them. First, he cites *Oakes v. Astrue*, 258 F. App'x 38 (7th Cir. 2007) to support his position that the ALJ effectively substituted his own judgement when he rejected Dr. Platt's opinion.  However, there, the Seventh Circuit found that the ALJ erred when giving no weight to the treating physician's opinion not because there was other contrary evidence, but because the ALJ's understanding of the rule was wrong.  258 F. App'x at 44.  The ALJ "asserted that the opinion of the treating physician" was "to be given no special weight because it concerned [the claimant's] residual functional capacity," a determination reserved for the ALJ. 258 F. App'x at 44.  Here,

14

the ALJ himself acknowledged that Dr. Platt was a treating physician whose opinion must be contemplated, but ultimately he found that "the limits endorsed are inconsistent with findings made by Dr. Platt, and with normal psychiatric examinations otherwise made by numerous treating sources." (Tr. 25).

Next, James W. relies on *Gudgel v. Barnhart*, 345 F.3d 467 (7th Cir. 2003). In that case, the Seventh Circuit found that the ALJ erred by rejecting a treating physician's diagnosis of post-polio syndrome at step 2. 345 F.3d at 469. The ALJ made this decision based on the fact that the claimant "had not shown that his complaints of pain and weaknesses were supported by evidence in the record." 345 F.3d at 469. This is not similar to the circumstances in this case. At step 2, the ALJ found that the James W. had the following severe impairments: degenerative disc disease, status post lumbar fusion, *anxiety, depression/bipolar disorder, and schizoaffective disorder*. (Tr. 23). The ALJ did not reject Dr. Platt's diagnoses. Rather, the ALJ rejected Dr. Platt's opinion that James W. was disabled and unable to work because of the existence of substantial evidence to the contrary. *See Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (finding "a claimant … is not entitled to disability benefits simply because a physician finds that the claimant is "disabled" or "unable to work"). Additionally, the ALJ in *Gudgel* relied on the opinion of a doctor who did not examine the claimant when he dismissed the treating physician's diagnosis. 345 F. 3d at 470. The ALJ here relied on records from James W.'s inpatient treatment, during addiction services intake, as well as the James W.'s own explanations for experiencing his heightened symptoms which consisted mainly of legal issues. James W.'s inpatient treatment, addiction services intake, and visits with Dr. Platt all took place within the same period of about three years.

James W.'s second argument is that the ALJ failed to reconcile his RFC determination with the opinions of the state agency psychological consultants, rendering his RFC determination

15

unsupported by substantial evidence.  James W. argues that the ALJ failed to explain why he found James W. to be more capable than what the state agency psychological consultants determined him to be.

The state agency psychological consultants opined that James W. had severe mental impairments, "but that the claimant retains the capacity to complete simple work tasks, to relate on at least a superficial basis with supervisors and coworkers, and that he can attend to tasks and manage the stresses of unstilled work." (T. 31). The ALJ's RFC determination limits James W. to "occasional" contact with supervisors and coworkers.  James W. argues that the ALJ did not provide an explanation as to why he found that James W. could tolerate "occasional" contact as opposed to "superficial" interaction with coworkers.  He further claims that a limitation to superficial contact would "preclude all work, as supervision is a necessary requirement of work." (Pet. Br. 14).

This argument is without merit.  The fact that James W. is purporting superficial to mean absolutely no contact with coworkers and supervisors is strained.  Superficial is defined as "existing or occurring at or on the surface," and occasional is "occurring or appearing at irregular or infrequent intervals; occurring now and then." *Superficial*, DICTIONARY, https://www.dictionary.com/browse/superficial (last visited Jan 11, 2021); *Occasional*, DICTIONARY, https://www.dictionary.com/browse/occasional (last visited Jan. 11, 2021).  The very definition of superficial provides for contact and cannot be interpreted to mean no contact whatsoever.  To find a substantial difference in the use of the two words is simply knit picking.

Based on the foregoing reasons, the decision of the Commissioner is **AFFIRMED.**

ENTERED this 13th day of January, 2021.

/s/ Andrew P. Rodovich
United States Magistrate Judge

16